## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

Henry Frazier,

        Plaintiff,

v.                                 Case No. 19-2020-JWL

GPI KS-SH, Inc.
d/b/a Shawnee Mission Hyundai and
Group 1 Automotive, Inc.,

        Defendants.

### MEMORANDUM & ORDER

Plaintiff filed this lawsuit against defendants alleging race discrimination, racial harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. This matter is presently before the court on defendants' motion for summary judgment on all claims (doc. 45). As will be explained, the motion is granted in part and denied in part. Specifically, the motion is granted as to plaintiff's claim that defendants distributed sales leads based on race; granted as to plaintiff's claim that defendants denied him a bonus based on race; granted as to plaintiff's claim of racial harassment; denied as to plaintiff's discriminatory discharge claim; denied as to plaintiff's failure-to-promote claim; and denied as to plaintiff's retaliatory discharge claim.[1]

---

[1] Both parties sought leave to file certain exhibits to their submissions under seal (doc. 51, 53). The court granted those motions to expedite the processing of the motion for summary judgment but advised the parties that it would revisit the sealing issue after a ruling on the merits of the motion for summary judgment. To the extent those motions remain under advisement, they are now denied because neither party has overcome the presumption in favor of public access. *United States v. Pickard*, 733 F.3d 1297, 1302 (10th Cir. 2013). To begin, neither party ever

## I.      Facts

The following facts are stipulated in the pretrial order, uncontroverted, or related in the light most favorable to plaintiff as the nonmoving party.  Defendant GPI KS-SH, Inc. d/b/a Shawnee Mission Hyundai ("SMH") was an automotive dealership located in Merriam, Kansas that sold and serviced new and preowned Hyundai vehicles as well as other manufacturers' preowned vehicles.  Defendant Group 1 Automotive, Inc. owned and operated SMH.  Defendants took over ownership and operation of the SMH dealership in February 2012.  Plaintiff Henry Frazier, an African-American male, had been working for SMH under the prior ownership as a salesperson.  He was hired by defendants and continued to work as a salesperson at the SMH dealership.

Donnie Raybourn, a Caucasian male, was the General Manager of the dealership beginning in February 2012 and he held that position until July 2013, when he left to pursue an opportunity at another dealership that was not associated with defendants.  On September 24, 2017, Mr. Raybourn returned to the dealership as the General Manager.  Shortly thereafter, the dealership's New Vehicle Sales Manager and Used Vehicle Sales Manager both requested transfers to another dealership.  Plaintiff told Mr. Raybourn that he was interested in one of the open sales manager

---

actually sealed the documents that the court authorized for sealing so those documents have been available to the public at all times.  This clearly cuts against any argument that the documents require protection.  Second, the court relied on many of those documents in resolving the motion for summary judgment, which clearly weighs in favor of public access.  *Id.*  And lastly, the only reason articulated by the parties for sealing is that the documents were designated "confidential" by the parties pursuant to the protective order in this case—a fact that has no bearing on whether a document should be maintained under seal.  The court has reviewed the documents that the parties seek to seal and discerns no sensitive or private information in those documents.  For all these reasons, the motions to file under seal are denied.

positions.  Plaintiff had prior sales management experience and he was consistently one of the dealership's top sellers.  Mr. Raybourn did not review plaintiff's personnel file and it is unclear whether he had any knowledge of plaintiff's qualifications.  According to plaintiff, Mr. Raybourn simply told him not to "worry about being a manager" and to "just sell cars."  Ultimately, Mr. Raybourn contacted two individuals with whom he had worked previously and hired those individuals.  Gerald Bentley, a Caucasian male, was hired as the New Car Sales Manager and Charlie Ross, a Caucasian male, was hired as the Used Car Sales Manager.  Mssrs. Bentley and Ross began their employment on November 1, 2017.

Plaintiff testified that, around this time, Mr. Raybourn began making race-based remarks in the workplace.  According to plaintiff, Mr. Raybourn told plaintiff on one occasion that he had "nappy hair."  On another occasion when plaintiff was eating watermelon in the workplace, Mr. Raybourn commented "I know you like watermelon," a remark that plaintiff testified was based on racial stereotypes.  Plaintiff also comes forward with evidence of a race-based remark that he overheard—Mr. Raybourn told Mr. Bentley, who was married to an African-American woman, that he knew that Mr. Bentley "liked a little brown sugar."

In November 2017, Mr. Raybourn held a sales contest in which any salesperson who sold three cars on a particular Saturday would earn a $300 bonus.  According to plaintiff, he sold three cars on that Saturday but Mr. Raybourn refused to pay him the bonus, despite the fact that Mr. Bentley told Mr. Raybourn that plaintiff had qualified for the bonus.  Mr. Raybourn testified that one of plaintiff's sales did not count because the customer who purchased the car had visited the dealership the day before to look at the car.  According to Mr. Raybourn, only those salespersons who originated and closed three sales on that Saturday were entitled to the bonus.

In December 2017, Mr. Raybourn changed the way in which incoming phone "leads" were distributed.  According to Mr. Raybourn, the dealership was spending thousands of dollars on advertising through lead-generating sources such as cargurus.com and cars.com, but the dealership had not been accurately tracking whether and to what extent phone leads were coming from these sources.  In other words, the dealership could not determine the return on its advertising investment.  Thus, all phone leads that came into the dealership were sent from the receptionist to the sales managers, who were responsible for entering the customer information and recording necessary data into the dealership's Customer Relationship Management ("CRM") system.  According to defendants, the sales managers then assigned the leads in a round-robin fashion to an available salesperson.  Plaintiff testified that he received significantly fewer phone leads after the new distribution system was implemented.  He testified that he observed that Caucasian salespersons were receiving three to five phone leads on days when he received none.  Prior to Mr. Raybourn's change, phone leads were distributed by the receptionist directly to the first salesperson who picked up the phone.

On December 9, 2017, Dion Monroe, an African-American salesperson, complained to Mr. Ross that Mr. Ross was "stealing" from him because he had reassigned a sales lead from Mr. Monroe to another salesperson, a Caucasian male.  During that conversation, Mr. Monroe complained that Mr. Ross was continually taking leads from him and giving them to "your boys."  Plaintiff joined the conversation and told Mr. Ross that he was a "racist."  According to plaintiff, both Mr. Monroe and plaintiff told Mr. Ross during that conversation that they believed that Mr. Ross was giving more phone leads to Caucasian salespersons and that he was giving more promising phone leads to Caucasian salespersons.  Mr. Ross took the complaint to Mr. Raybourn,

4

who then had a meeting with Mr. Ross, Mr. Monroe and plaintiff.  Mr. Raybourn was upset that Mr. Monroe and plaintiff had decided to, in Mr. Raybourn's words, "cry racism" with respect to lead distribution.   He testified that he thought the allegations were "a cheap shot and below the belt."   Mr. Raybourn further testified that plaintiff was "very vocal" about racism and that plaintiff's comments about potential racism in the workplace, which Mr. Raybourn believed to be without any factual basis, were disruptive to the dealership's business.  Begi Velasquez, a finance manager at the dealership, averred that Mr. Raybourn told her that plaintiff and Mr. Monroe were "disruptive on the floor because everything was a race issue for them" and that he "made it clear that he wanted to get rid" of those employees.[2]

After meeting with Mr. Ross, Mr. Monroe and plaintiff, Mr. Raybourn sent an email to Julie Stockwood, a human resources manager for defendant Group 1 Automotive, Inc.  In that email, Mr. Raybourn advised Ms. Stockwood that he had held a meeting with those individuals to "confront alleged racial biases" from Mr. Ross and that Mr. Monroe and plaintiff indicated during the meeting that the lead distribution issue "illustrated preferential treatment from managers" to help Caucasian employees "while discriminating against other salespersons based on their skin color."   Ms. Stockwood understood from Mr. Raybourn's email that Mr. Monroe and plaintiff were making allegations of racial discrimination in connection with the distribution of sales leads.

---

[2] Defendants contend that this aspect of Ms. Velasquez's affidavit constitutes inadmissible hearsay. The objection is overruled, as the statement appears to be offered to show the motivation underlying the employment decisions rather than to prove the truth of the statements themselves. *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991) (exhibit not hearsay because it was not offered to prove the truth of its contents, but to show defendant's motivation during a reduction in force).  Thus, while the question of the admissibility of this evidence may arise again at trial, the court deems it appropriate at this stage to consider such evidence in determining whether plaintiff has created a factual dispute on any of his claims.

On Saturday, February 17, 2018, a customer came into the store asking for Mr. Ross. Because Mr. Ross was not available, plaintiff took the customer for a test drive in the car that the customer was interested in. The customer left and said that he would return at some point. Plaintiff told Mr. Ross that the customer should be assigned to him because he had already spent time with the customer. Mr. Ross disagreed with plaintiff. Plaintiff then complained to Mr. Raybourn that he believed that Mr. Ross was giving leads to "your boys." Mr. Raybourn disagreed, to which plaintiff responded, "That's bullshit!" on the showroom floor. Plaintiff testified that his complaint about Mr. Ross giving leads to "your boys" was a complaint that Mr. Ross was giving leads to Caucasian salespeople based on race and he testified that Mr. Raybourn understood the complaint accordingly, based on plaintiff's and Mr. Monroe's December 9, 2017 complaint. Defendants dispute that Mr. Raybourn understood the reference to "your boys" as a reference to Caucasian salespersons.

Later that same day, a potential customer, Jennifer Beck, called the dealership to discuss whether the dealership had any vehicles for which she qualified for financing in light of her credit history and for which she could afford the monthly payment in light of her budget concerns. After running the numbers and processing Ms. Beck's credit application through Credit Acceptance Corporation, Mr. Ross concluded that the dealership had only one vehicle that met Ms. Beck's requirements—a 2009 Honda Civic. When Ms. Beck came to the dealership, Mr. Ross cautioned plaintiff that he could only put Ms. Beck in the 2009 Honda Civic because she could not obtain financing for any other vehicle and maintain her desired monthly payment amount. But Ms. Beck told plaintiff that she was not interested in the Civic because it was too small. In the meantime, Ms. Velasquez told plaintiff that she was familiar with Ms. Beck's credit application and that there

6

were other cars for which Ms. Beck could qualify for financing.  Ultimately, plaintiff showed Ms. Beck a Chevrolet Malibu which, according to defendants, required a higher down payment and a higher monthly payment than the Civic. When plaintiff presented that information to Ms. Beck, she became upset and stormed out of the dealership close to 6pm that evening.   After Ms. Beck left the dealership, plaintiff and Mr. Ross became engaged in a short, heated argument about plaintiff's handling of the situation with Ms. Beck.  Shortly thereafter, plaintiff left work for the day without further incident.

On Monday, February 19, 2018, Mr. Raybourn emailed a draft Employee Notice of Warning to Ms. Stockwood with respect to plaintiff.  In that draft, Mr. Raybourn completed the "Description of Violation" section as follows:

> "Employee engaged in verbal harassment of management staff while working deal with customer.  Employee refused to show the customer the vehicle as directed by [management] staff.  Also, employee did not accompany customer on test drive."

In response, Ms. Stockwood indicated that she would obtain additional details from him and other witnesses and suggested that a suspension might be appropriate.  Ms. Stockwood then went to the dealership to interview Mr. Raybourn, Mr. Ross and Mr. Bentley.  During those interviews, Mr. Raybourn and Mr. Bentley told Ms. Stockwood that plaintiff frequently complained about phone leads being given to "your boys."  Ms. Stockwood testified that she understood, in light of the December 9, 2017 email she had received from Mr. Raybourn, that the reference to "your boys" meant Caucasian salespersons Prior to interviewing plaintiff, Ms. Stockwood prepared an Employee Notice of Warning so that, according to Ms. Stockwood, if they decided to proceed with termination after interviewing plaintiff, they would be ready with the paperwork.

On the final Employee Notice of Warning, Ms. Stockwood completed the Description of Violation section as follows:

> "Henry made a comment to GM Raybourn that he believed managers were giving customer phone calls to 'your boys.'  When GM told Henry that managers make appointments after the calls, Henry said "That's bullshit.'  A customer came in and Henry greeted them.  [Mr. Ross] had already spoken with the customer and instructed Henry to put the customer info into the system and he refused.  [Mr. Ross] told Henry which vehicle to sell the customer, he refused, and the customer went on a test drive without Henry.  Henry became angry, said he could not get any 'goddamn' help, then left the building, appearing to be shadow boxing.  He returned and punched a cardboard placard.  The customer left without a [manager turnover] and then Henry left for the day without prior approval.  This is not the first time that Henry has failed to control his emotions/conduct/language while on duty (see attached in support).

In the section entitled "Action to be Taken," Ms. Stockwood marked "Discharged."  She brought the form to the February 19, 2018 interview with plaintiff.  Mr. Raybourn attended that interview as well.  After Ms. Stockwood interviewed plaintiff, Mr. Raybourn advised plaintiff that he had decided to terminate his employment and he handed the final Employee Notice of Warning form to plaintiff.  According to Mr. Raybourn, he made the decision to terminate plaintiff's employment in part because plaintiff showed no contrition or remorse for his actions on February 17, 2018 during the interview.

Additional facts will be provided as they relate to the specific arguments raised by the parties in their submissions.

## II.   Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving

party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc*., 726 F.3d

1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a).  A factual issue is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Water Pik, Inc*., 726 F.3d at 1143 (quotation omitted).  "The nonmoving party is entitled

to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion

on a claim at trial, summary judgment may be warranted if the movant points out a lack of

evidence to support an essential element of that claim and the nonmovant cannot identify specific

facts that would create a genuine issue." *Id*. at 1143-44.

### III.    Race Discrimination

In the pretrial order, plaintiff asserts that defendants terminated his employment, failed to

promote him, and distributed sales leads and bonuses based on race.  Plaintiff concedes that he

has no direct evidence of discrimination, and his claims are therefore analyzed using the burden-

shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See*

*Daniels v. United Parcel Serv., Inc*., 701 F.3d 620, 627 (10th Cir. 2012).  Under *McDonnell*

*Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination.  *Id*.

To set forth a prima facie case of discrimination, plaintiff must establish "(1) membership in a

protected class and (2) an adverse employment action (3) that took place under circumstances

giving rise to an inference of discrimination." *Id.* (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800

(10th Cir. 2007)).  If he establishes a prima facie case, the burden shifts to defendants to assert a

legitimate, nondiscriminatory reason for the adverse employment action.  *Id.* If defendants meet

this burden, summary judgment against plaintiff is warranted unless he introduces evidence "that

the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id*. (citing *Simmons v. Sykes Enters*., 647 F.3d 943, 947 (10th Cir. 2011)).[3]

A.    *Discriminatory Discharge*

With respect to plaintiff's discriminatory discharge claim, defendants move for summary judgment on the grounds that plaintiff cannot establish a prima facie case of discrimination. Specifically, defendants contend that plaintiff's discharge does not give rise to an inference of discrimination. In support of that argument, however, defendants direct the court only to evidence concerning the basis for plaintiff's discharge—plaintiff's alleged misconduct on February 17, 2018. This argument, then, constitutes an impermissible "end run" around the *McDonnell Douglas* analysis and the court cannot consider it at the prima facie stage. *See, e.g., EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1192–94 (10th Cir. 2000) (requiring plaintiff to disprove defendant's proffered reason for employment decision to establish prima facie case would inappropriately short circuit *McDonnell Douglas* analysis). The court, then, rejects defendants' argument concerning plaintiff's prima facie case.

The court turns, then, to whether defendants have met their burden to articulate a legitimate, nondiscriminatory reason for the decision to terminate plaintiff's employment. This "burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder*

---

[3] The court's analysis of plaintiff's Title VII claims applies equally to his claims under § 1981. *See Crowe v. ADT Security Servs., Inc*., 649 F.3d 1189, 1194 (10th Cir. 2011) ("A plaintiff may prove violation of Title VII or 42 U.S.C. § 1981—the standards are the same—either by direct evidence of discrimination, or by adhering to the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).").

*Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)).  The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendants have carried it here.  *See id.* According to defendants, the decision to terminate plaintiff's employment was based on plaintiff's February 17, 2018 misconduct, coupled with his lack of remorse for his behavior on that day.  The burden of proof, then, shifts back to plaintiff to show that defendants' proffered reasons are pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances."  *Id.* at 1150 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).  A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently.  *Crowe v. ADT Servs., Inc.*, 649 F.3d 1189, 1197 (10th Cir. 2011). In essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing."  *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013).

The record evidence, reviewed in the light most favorable to plaintiff, is sufficient to cast doubt on defendants' proffered reasons.  To begin, while defendants urge in their submissions that plaintiff's February 17, 2018 comment to Mr. Raybourn about managers continuing to give sales leads to "your boys" was not a reason for plaintiff's discharge, the Employee Notice of Warning provided to plaintiff in connection with the termination decision references plaintiff's comment

in the first sentence of the "Description of Violation" section.  See Doc. 48-14, Ex. N ("Henry made a comment to GM Raybourn that he believed managers were giving customer phone calls to 'your boys.'").  Defendants argue that the reference to plaintiff's comment does not indicate that it was a basis for plaintiff's discharge but merely a description of the "sequence of events" leading up to plaintiff's "bullshit" remark, but a jury could reasonably conclude otherwise. Standing alone, this evidence is sufficient to cast doubt on defendants' stated reason for plaintiff's termination because it permits a jury to conclude that in fact another reason factored into that decision.

Other evidence in the record, viewed in the light most favorable to plaintiff and in combination with the evidence outlined above, further supports an inference of pretext with respect to plaintiff's discriminatory discharge claim.  There is evidence that Mr. Raybourn, the decisionmaker in this case, made a handful of arguably race-based remarks—calling plaintiff's hair "nappy," referring to Mr. Bentley's African-American wife as "brown sugar," and commenting on how plaintiff enjoyed eating watermelon.  *See Sotunde v. Safeway, Inc*., 716 Fed. Appx. 768 (10th Cir. 2017) (stray racial comments made by decisionmaker may factor into pretext analysis).  There is evidence that Mr. Raybourn was dismissive of plaintiff's suggestion that he wanted to be considered for a promotion.  *Danville v. Reg'l Lab Corp*., 292 F.3d 1246, 1251 (10th Cir. 2002) ("An employer's failure to give more than sham or pro forma consideration to a candidate or his or her qualifications, coupled with other circumstantial evidence of discriminatory intent, can demonstrate pretext.").  Lastly, the court believes that some of the evidence that is perhaps more pertinent to plaintiff's retaliation claim is sufficiently intertwined with plaintiff's discrimination claim and provides additional evidence of pretext in this context.  Mr. Raybourn

testified that plaintiff was "very vocal" about racism and that plaintiff's comments about potential racism in the workplace was disruptive to the dealership's business. Ms. Velasquez averred that Mr. Raybourn told her that plaintiff and Mr. Monroe were "disruptive on the floor because everything was a race issue for them" and that he "made it clear that he wanted to get rid" of those employees.

The court need not consider whether any piece of evidence discussed above, if considered by itself, would provide the necessary evidence of pretext to withstand summary judgment. But the court concludes that the totality of this evidence, considered in the light most favorable to plaintiff, creates a reasonable inference that defendants' stated reasons for the decision to terminate plaintiff's employment are pretextual. Summary judgment on this claim is denied.

B.    *Failure to Promote*

Plaintiff also contends that defendants, on the basis of plaintiff's race, failed to promote him to the new and used car sales manager positions in November 2017 and, instead, hired Gerald Bentley and Charlie Ross, Caucasian employees, to fill those positions. Defendants concede that plaintiff can establish a prima facie case of discrimination with respect to these claims but assert that summary judgment is nonetheless appropriate because plaintiff cannot establish that defendants' proffered reasons for the promotion decisions are pretextual. Toward that end, defendants assert that Mr. Raybourn selected Mssrs. Bentley and Ross for the positions based on Mr. Raybourn's belief that those individuals were more qualified than plaintiff in terms of their relevant experience and based on the fact that Mr. Raybourn had personally and recently worked with those individuals at other dealerships and knew that those individuals had prior success as

sales managers. Because defendants have satisfied their burden of production, the burden of proof shifts back to plaintiff to show that defendants' proffered reasons for the promotion decisions are pretextual.

The court believes that plaintiff has shown sufficient evidence of pretext to present his failure-to-promote claim to a jury. To begin, while defendants rely on Mr. Raybourn's stated belief that Mssrs. Bentley and Ross were more qualified than plaintiff, it is undisputed that Mr. Raybourn never reviewed plaintiff's personnel file and that he had very little, if any, knowledge about plaintiff's qualifications (in terms of prior management experience) at the time he made the decision to hire Mssrs. Bentley and Ross. A jury could reasonably infer, contrary to defendants' suggestion, that Mr. Raybourn did not actually assess plaintiff's qualifications when he filled those positions. Moreover, the fact that Mr. Raybourn dismissed out of hand plaintiff's interest in the positions—advising him not to "worry" about being a manager—further permits an inference that Mr. Raybourn did not consider plaintiff a viable candidate regardless of his qualifications. *See Danville*, 292 F.3d at 1251 ("An employer's failure to give more than sham or pro forma consideration to a candidate or his or her qualifications, coupled with other circumstantial evidence of discriminatory intent, can demonstrate pretext."). When these pieces of evidence are viewed together with Mr. Raybourn's arguably race-based remarks, his alleged concerns that "everything was a race issue" for plaintiff, and his alleged desire to get rid of plaintiff, a reasonable inference can be drawn that defendants' stated reasons for failing to promote plaintiff are not the true reasons for that decision. Again, the court does not mean to suggest that any particular piece of evidence, standing alone, would satisfy plaintiff's burden to establish pretext. But when viewed in combination and in the light most favorable to plaintiff, the court believes that the evidence is

sufficient to permit a reasonable jury to find defendants' proffered reasons for the promotion decisions are pretextual.  Summary judgment on this claim is denied.[4]


C.      *Discriminatory Distribution of Phone Leads*

Plaintiff asserts in the pretrial order that defendants, in December 2017, began distributing phone leads based on race.  Defendants move for summary judgment on the grounds that plaintiff cannot establish that the unequal distribution of phone leads constitutes an adverse employment action.  Specifically, defendant contends that plaintiff's evidence concerning monetary loss stemming from the allegedly discriminatory distribution of phone leads is insufficient to permit a jury to conclude that he suffered an adverse employment action.  As will be explained, the court agrees that no reasonable jury could conclude based on the evidence in the record that plaintiff suffered any adverse employment action in connection with the distribution of phone leads.  The court, then, declines to address defendants' remaining arguments in support of their motion and grants summary judgment in favor of defendants on this claim.

To establish a prima facie case of discrimination in connection with the distribution of phone leads, plaintiff must establish that he suffered an adverse employment action.  *See Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007).  The Tenth Circuit construes "adverse

---

[4] In support of his pretext argument, plaintiff also directs the court to evidence that he contends demonstrates a history or pattern of failing to promote African-American employees to management positions at the dealership. Defendants contend that none of that evidence is relevant because Mr. Raybourn was admittedly not the decisionmaker with respect to any of those positions.  Because the court finds that plaintiff has satisfied his burden of showing pretext even without this evidence, the court expresses no opinion at this juncture on the relevance or admissibility of that evidence at trial.

employment action" broadly and the phrase obviously includes monetary losses in the form of wages and benefits. *See Sanchez v. Denver Public Schs.*, 164 F.3d 527, 532 (10th Cir. 1998). Here, plaintiff attempts to show that he suffered an adverse employment action by showing that the denial of phone leads resulted in monetary loss. His evidence, however, is insufficient to create a fact question on this issue. Plaintiff's evidence is limited to his affidavit in which he avers that approximately 15-20 percent of his income came from phone leads and that his annual income in 2017 was significantly less than his annual income in prior years.[5] But the phone lead process did not change to the allegedly discriminatory system until December 2017. Plaintiff has no evidence suggesting that his income for that month (or any period after that time) decreased at all. Rather, his evidence is only that his annual income for 2017 decreased. Nothing in the record reflects whether his income for the month of December was less than other months or reflects whether any decrease in December was based on a decrease in phone leads or some other factor such as a decrease in sales at the dealership generally. In other words, there is simply no evidence from which a jury could conclude that plaintiff suffered any monetary loss in December 2017 or afterwards and no evidence from which a jury could conclude that any loss during that time was a result of a loss of phone leads. In such circumstances, plaintiff cannot establish that he suffered any monetary loss from the unequal distribution of phone leads. Summary judgment is granted on this claim. *Compare Ramirez v. Olympic Health Mgmt. Sys., Inc.*, 610 F.Supp.2d 1266, 1280–81 (E.D. Wash. 2009) (finding lost sales opportunities as a result of inequitable lead distribution

---

[5] The record contains no evidence, for example, concerning the number of phone leads entered into the CRM system in December 2017 (or any other time) and no evidence concerning which salespersons were assigned those leads. There is no evidence about the approximate number of leads that plaintiff typically received before or after the distribution process changed.

constitutes an adverse employment action where expert testified about the tangible sales plaintiff lost) *with Shabaz v. Senior Care Ins. Servs., Inc*., 2018 WL 3647124, at *6 (N.D. Ind. July 31, 2018) (employee who challenged the manner in which supervisor provided her with sales leads did not establish adverse employment action because she failed to produce any evidence that her base compensation or the amount she could earn in commission declined); *Powell v. Freedom Fin. Network*, 2019 WL 1114904, at *6 (D. Ariz. Mar. 11, 2019) (although manipulating an employee's sales leads could be considered an adverse action, plaintiff did not provide specific or substantial evidence that employer's distribution of sales leads affected employee's sales performance); *Andreas v. Nw. Mut. Life Ins. Co*., 2009 WL 10666049, at *7 (D.N.M. Mar. 5, 2009) (absent evidence of some tangible effect upon plaintiff's employment, no jury could find that plaintiff experienced adverse employment action related to the distribution of leads); *and Brown v. Sybase, Inc*., 287 F. Supp. 2d 1330 (S.D. Fla. 2003) (unequal distribution of sales leads did not constitute adverse employment action in the absence of evidence as to the extent of any impact that reduction in sales leads had on actual sales).

D.     *Discriminatory Denial of Bonus*

Plaintiff also asserts that defendants, on one occasion in November 2017, denied him a $300 bonus in connection with a sales contest. In their motion for summary judgment, defendants contend that plaintiff cannot establish the requisite adverse employment action for purposes of this claim because $300 is not "significant." Defendants direct the court to no Tenth Circuit authority suggesting that a plaintiff is required to show a "significant" monetary loss to establish an adverse employment action. Similarly, defendants direct the court to no Tenth Circuit authority

suggesting that $300 in the context of this case is a de minimis loss of pay that cannot establish an adverse employment action. The Tenth Circuit construes "adverse employment action" broadly and the phrase obviously includes monetary losses in the form of wages and benefits. *See Sanchez*, 164 F.3d at 532 (Circuit defines adverse employment action liberally and includes monetary losses). The court, then, concludes that a factual issue exists as to whether the denial of the bonus constitutes an adverse employment action.

Defendants further assert that summary judgment is appropriate with respect to plaintiff's discriminatory denial of bonus claim because plaintiff cannot establish an inference of discrimination—the third element of his prima facie case. Plaintiff, in response, states that Mr. Raybourn gave the $300 bonus to a Caucasian sales employee under the same circumstances in which he denied the bonus to plaintiff. *See Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011) ("One method by which a plaintiff can demonstrate an inference of discrimination is to show that the employer treated similarly situated employees more favorably."). Specifically, plaintiff testified that Dave Burris received the bonus from Mr. Raybourn despite the fact that one of the three sales that Mr. Burris made on the Saturday of the contest was to a customer who had initially viewed the vehicle on the day prior to the contest. But as defendants highlight, plaintiff's testimony does not support this assertion. Plaintiff testified that, in fact, he had no knowledge of whether any of the customers that "counted" towards Mr. Burris's bonus had come in prior to the day of the contest. Plaintiff testified only that customers "typically" do not come in and buy a car on the first day that they look at a car. Even viewed in plaintiff's favor, this evidence is insufficient to permit a jury to conclude that Mr. Burris received the bonus under the same circumstances in which plaintiff did not receive the bonus. The only other evidence that plaintiff offers to show an

18

inference of discrimination is his testimony that Mr. Bentley told Mr. Raybourn that plaintiff qualified for the bonus. This evidence is not relevant when it is undisputed that Mr. Raybourn established the contest rules and determined who qualified for the bonus under those rules. *See Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1231 (10th Cir. 2000) (proper challenge of pretext considers the facts as they appear to the person making employment decision); *Boston v. Blue Cross & Blue Shield of Kansas, Inc.,* 431 Fed. Appx. 763, 767 (10th Cir. 2011) ("[T]he perceptions and speculation of a non-decisionmaker colleague counts for little in [the pretext] inquiry.").

Moreover, plaintiff offers no evidence that defendants' proffered reason for denying the bonus to plaintiff is pretextual. According to Mr. Raybourn, the purpose of the contest was to reward a salesperson who "closed" three customers in one day or, stated another way, who originated three sales on the day of the contest. Mr. Raybourn was concerned that salespersons were finalizing sales before the day of the contest but then not "delivering" the car or marking that car as sold until the day of the contest so that the sale would count toward the three-car requirement. Thus, Mr. Raybourn refused to consider any transaction in which the customer had come in the day before the sale but accepted delivery of the car on the day of the contest. Plaintiff does not dispute that he did not originate three sales on the day of the contest and he has no evidence that any other salesperson received the $300 bonus despite not having originated three sales on the day of the contest. In short, plaintiff has no evidence from which a jury could infer that Mr. Raybourn's proffered reason for denying plaintiff the $300 bonus is pretextual. Summary judgment on this claim is granted.

## IV.    Racial Harassment Claim

In the pretrial order, plaintiff contends that defendants subjected him to racial harassment sufficiently pervasive to alter the terms and conditions of his employment. To carry his burden, plaintiff must show that he is a member of a protected group; he was subject to unwelcome harassment; the harassment was based on race; and due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of his employment and created an abusive working environment. *Payan v. United Parcel Service*, 905 F.3d 1162, 1170 (10th Cir. 2018); *Sandoval v. City of Boulder*, 388 F.3d 1312, 1326-27 (10th Cir. 2004) (plaintiff asserting racial harassment must produce evidence that he or she was targeted for harassment based on race). As explained below, plaintiff's racial harassment claim fails because he has not produced evidence from which a rational jury could infer that the conduct about which he complains was based on his race or, for those isolated incidents that were based on his race, that the harassment amounted to pervasive harassment sufficient to alter the conditions of his employment.[6]

---

[6] In evaluating plaintiff's harassment claim, the court considers only evidence of comments or conduct relating to harassment of which plaintiff was aware during the time that he was allegedly subjected to a hostile work environment. Thus, the court disregards certain evidence in the record from other employees about Mr. Raybourn's conduct because plaintiff has failed to produce evidence indicating that he himself had knowledge of that conduct during his employment. For example, plaintiff directs the court to evidence from another employee that, on one occasion, Mr. Raybourn made arguably discriminatory statements about females; that he was "notorious" for making negative remarks about "certain ethnicities;" that he made jokes to the dealership's finance manager about that manager's national origin; and that on one occasion he "talked down" to a Hispanic customer. In the absence of any evidence that these comments were part of his actual work environment, the court cannot consider those comments in evaluating whether plaintiff suffered a hostile work environment. Similarly, the court disregards evidence that, after plaintiff's employment ended, someone showed him an allegedly "Islamophobic" Facebook post that Mr. Raybourn posted to his private Facebook account. *See Hirase–Doi v. U.S. W. Commc'ns, Inc.*, 61

In support of his claim, plaintiff presents evidence that Mr. Raybourn, on one occasion in 2013, was rude to a Pakistani customer; that Mr. Raybourn made a comment about a Hispanic receptionist not returning to work after her maternity leave; and that Mr. Raybourn, on one occasion, made an inappropriate remark about homosexuals.  Plaintiff makes no effort to tie any of these incidents to plaintiff's race and the record reveals no connection.  Similarly, he alleges that Mr. Ross and Mr. Bentley on occasion made notes in the CRM system about foreign-born customers, such as "fresh off the boat" or "English is not his strong suit."  While the court may certainly consider comments referencing third parties in determining whether an individual was subjected to a hostile work environment, those comments nonetheless must have some connection to discrimination against plaintiff based on plaintiff's race.  *See, e.g., Nicolosi-Russo v. Program Brokerage Corp.*, 2006 WL 3690654, at *5 (S.D.N.Y. Dec. 13, 2006).  In other words, "to be taken toward a cognizable employment discrimination claim, it is necessary that any allegation of offensiveness about third parties suggest some discriminatory link between that offensiveness and plaintiff."  *Id.*  No such connection is made here and, as such, no reasonable jury could infer from these comments or conduct that plaintiff experienced harassment based on his race.

To the extent plaintiff does have evidence of race-based conduct, that conduct simply does not rise to the level of pervasive harassment sufficient to permit a jury to conclude that the conditions of plaintiff's employment were altered.  A plaintiff "does not make a showing of a

---

F.3d 777, 782 (10th Cir. 1995), *superseded on other grounds by Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) (a plaintiff "may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment").  And, of course, even if plaintiff could somehow establish that he had knowledge of these incidents during his employment, no reasonable jury could conclude that any of this conduct was based on plaintiff's race.

pervasively hostile work environment by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs. Instead, there must be a steady barrage of opprobrious racial comments." *Herrera v. Lufkin Indus., Inc*., 474 F.3d 675, 680 (10th Cir. 2007).  No "steady barrage" is present here.  Plaintiff directs the court to only one overtly racial remark directed at him and one arguably racial remark directed at him.   According to plaintiff, Mr. Raybourn told plaintiff on one occasion that he had "nappy hair."   On another occasion when plaintiff was eating watermelon in the workplace, Mr. Raybourn commented "I know you like watermelon."   Plaintiff also comes forward with evidence of a race-based remark that he overheard—Mr. Raybourn told Mr. Bentley, who was married to an African-American woman, that he knew that Mr. Bentley "liked a little brown sugar."   These three remarks do not make plaintiff's workplace permeated with discriminatory intimidation, ridicule and insult and fall far short of the "steady barrage" required for a racially hostile environment claim.  *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (holding that two racially offensive remarks "[fell] far short of the 'steady barrage' required for a [racially] hostile environment claim").

Plaintiff's evidence also includes a Facebook post made by Mr. Raybourn on his private Facebook account concerning Michael Brown, an African-American man who was killed by police in Ferguson, Missouri.  The post was a picture of Michael Brown with the caption "Congrats Mike, Two Years Crime Free."  Plaintiff contends that the post was discriminatory and that he was offended by it.  But plaintiff saw the post only because a former employee took a screen shot of the post and showed it to plaintiff outside the workplace.  There is no evidence that the post was ever circulated at the dealership and plaintiff was not "friends" with Mr. Raybourn on Facebook such that he would have been exposed to the post but for the former employee's act

in sharing the post with him.  In such circumstances, no reasonable jury could conclude that Mr. Raybourn discriminated against plaintiff by virtue of this post or that the post altered plaintiff's employment or affected his work environment.

Plaintiff attempts to buttress his racial harassment claim with evidence that Mr. Raybourn required Mr. Ross and Mr. Bentley to enter each customer's race into the CRM system.  Mr. Raybourn testified that managers were required to enter all available information about every customer, including race, into the system so that any salesperson could step in and take over any sale to any customer if necessary.  Plaintiff does not indicate that managers only identified the race of African-American customers such that African-American customers were singled out for this practice.  Moreover, plaintiff does not contend that he was offended by this practice—only that it made no sense to him and he found it unnecessary. Similarly, he contends that he observed African-American customers "waiting longer" than other customers to obtain financing approval in connection with the purchase of vehicles.  But plaintiff is not able to articulate any specifics about his observations, including any specific customers who were required to wait or any understanding about why one customer might have had to wait longer than another for financing approval.  He also fails to tie his observations to discrimination against him based on his race.  In the absence of evidence that these alleged practices altered plaintiff's work environment or were based on plaintiff's race, no reasonable jury could find that such conduct contributed to a racially hostile work environment.

The court recognizes that it is required to take a "holistic" approach in analyzing plaintiff's evidence of a racially hostile work environment, *Lounds v. Lincare, Inc*., 812 F.3d 1208, 1227 (10th Cir. 2015), but that analysis does not support a finding that plaintiff's environment was

23

"polluted" with racially offensive harassment.  After stripping away conduct that is not based on plaintiff's race, conduct that plaintiff was not aware of, and conduct that was otherwise not part of plaintiff's work environment, the remaining conduct simply does not rise to the level of pervasiveness required to establish a hostile work environment claim under Tenth Circuit precedent.  Stated another way, plaintiff has failed to set forth a genuine issue of material fact as to whether the remaining conduct was sufficiently pervasive so as to alter the terms and conditions of his employment.  Tellingly, in cases involving far more egregious facts than those alleged by plaintiff, the Circuit has held that the evidence of pervasiveness was a "close" question.  *Id.* at 1213-17, 1227 (10th Cir. 2015) (involving multiple and continual references to racial stereotypes, a discussion of lynching, habitual use of the term "nigga" and references to "the hood," and direction to address a vice president with "yes massa"); *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680-82, 683 (10th Cir. 2007) (involving several discrete incidents of racial harassment over four years and ongoing harassment, including comments referring to plaintiff's ethnicity every two to three days).  Summary judgment on plaintiff's racial harassment claim is appropriate.

## V.    Retaliation

Finally, plaintiff asserts that defendants terminated his employment in retaliation for his complaints about race discrimination.  In their motion for summary judgment, defendants, using the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), assert that plaintiff cannot establish a prima facie case of retaliation and cannot show that defendants' articulated reason for terminating plaintiff's employment is pretextual. As an initial matter, plaintiff contends that he has come forward with direct evidence of retaliation, thus

obviating the need for the *McDonnell Douglas* analysis. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (holding that the *McDonnell Douglas* framework does not apply once plaintiff has presented direct evidence of discrimination). Specifically, plaintiff asserts that the first reason given for plaintiff's termination on the Employee Notice of Warning was that plaintiff "made a comment to GM Raybourn that he believed managers were giving customer phone calls to 'your boys.'"  According to plaintiff, the Employee Notice of Warning specifically indicates that plaintiff was terminated for complaining of race discrimination in light of the earlier factual context in which, according to plaintiff, Mr. Raybourn and Ms. Stockwood understood that the phrase "your boys" was intended as a reference to Caucasian employees.

According to established Tenth Circuit precedent, a "plaintiff proves discrimination by direct evidence when she presents proof of 'an existing policy which itself constitutes discrimination,'" *see Stone v. Autoliv ASP, Inc*., 210 F.3d 1132, 1136-37 (10th Cir. 2000) (citations omitted), or when he or she presents proof that the employer actually relied on a protected characteristic in making its employment decision (*i.e*., a statement by a decisionmaker during the decisional process showing discriminatory animus), *see Ramsey v. City and County of Denver*, 907 F.2d 1004, 1008 (10th Cir. 1990) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)). As explained by the Tenth Circuit:

> Comments in the workplace that reflect personal bias do not qualify as direct evidence of discrimination unless the plaintiff shows the speaker had decisionmaking authority and acted on his or her discriminatory beliefs. We also have explained that discriminatory statements do not qualify as direct evidence if the context or timing of the statements is not closely linked to the adverse decision. Furthermore, if the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence.

*Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citations omitted).

Here, the content and context of the statement in the Employee Notice of Warning allow for the statement to be plausibly interpreted in two different ways, one of which is benign. Even plaintiff concedes in his brief that defendants "are free to tell the jury" that Mr. Raybourn did not understand that the phrase "your boys" was a reference to Caucasian employees. In other words, the jury could interpret the statement in more than one way and, as such, the statement necessarily constitutes circumstantial evidence of discrimination. The statement in the Employee Notice of Warning requires the trier of fact to draw an inference that plaintiff's termination was based on his complaint of race discrimination in light of events and conversations that occurred in December 2017 outside the context of plaintiff's termination. *See Didier v. Abbott Laboratories*, 614 Fed. Appx. 366, 372-73 (10th Cir. July 31, 2015); *Stone*, 210 F.3d at 1136-37 (evidence is not direct evidence if it requires a trier of fact to infer discrimination); *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (workplace comments cannot constitute direct evidence of discrimination if they can plausibly be interpreted in two ways—one discriminatory, one benign).

For the foregoing reasons, the court will analyze defendants' motion for summary judgment on plaintiff's retaliation claim under the *McDonnell Douglas* standard. To state a prima facie case for retaliation, plaintiff must show that (1) he engaged in protected opposition to discrimination, (2) a reasonable worker would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). If plaintiff presents a prima facie case of retaliation, then defendants must respond with a legitimate, nonretaliatory reason for the challenged action. *Parker Excavating, Inc. v. Lafarge*

26

*W., Inc.*, 863 F.3d 1213, 1220 (10th Cir. 2017).  If defendants satisfy this burden, plaintiff must show that defendants' reason was merely a pretext for retaliation.  *Id.*

In their motion for summary judgment, defendants contend that plaintiff cannot establish the first or third elements of his prima facie case.  According to defendants, the December 9, 2017 incident in which plaintiff called Mr. Ross a "racist" is not sufficient to constitute protected activity.  In support of this argument, defendants direct the court to cases in which courts have held that a "single act" of calling a supervisor a "racist," without any connection to a specific employment practice or policy, generally does not qualify as protected activity for purposes of a retaliation claim.  *See, e.g., Ceus v. City of Tampa*, ___ Fed. Appx. ___, 2020 WL 525559, at *8 (11th Cir. Feb. 2, 2020) (plaintiff who generally decried "racism" within department did not engage in protected activity because he did not tie that assertion to any specific discrimination he or anyone else faced within the department); *Gress v. Temple Univ. Health Sys.*, 784 Fed. Appx. 100, 106 (3d Cir. 2019) (plaintiff who asserted that supervisor was "racist" did not engage in protected activity where she failed to put forth evidence of illegal employment practice).  Unlike those cases, however, the uncontroverted facts here demonstrate that plaintiff called Mr. Ross a "racist" in the specific context of a conversation about Mr. Ross's distribution of sales leads and his reassignment of Mr. Monroe's sales lead to a Caucasian employee.  Moreover, the uncontroverted evidence demonstrates that Mr. Raybourn investigated plaintiff's assertion as an allegation of preferential treatment based on race in the distribution of sales leads.  Quite clearly, then, a jury could reasonably infer—just as Mr. Raybourn did—that plaintiff raised specific concerns about race discrimination in connection with a specific employment practice.

27

Defendants further assert that plaintiff cannot establish a causal connection between any protected activity and the decision to terminate plaintiff's employment.  According to defendants, while it is uncontroverted that plaintiff called Mr. Ross a "racist" on December 9, 2017, no causal connection exists between that statement and the termination decision because Mr. Ross was not the person who decided to terminate plaintiff's employment more than two months later.  The court rejects this argument.  Mr. Raybourn clearly had knowledge of plaintiff's December 2017 complaint and investigated that complaint as one of race discrimination.  Mr. Raybourn then terminated plaintiff's employment roughly two months later—and two days after plaintiff, viewing the evidence in the light most favorable to him, complained to Mr. Raybourn about potential racial discrimination in connection with the distribution of sales leads.  Thus, the fact that Mr. Ross did not terminate plaintiff's employment is clearly not fatal to plaintiff's retaliation claim.

The court turns, then, to the rest of the *McDonnell Douglas* framework.  As noted earlier, defendants assert that plaintiff's employment was terminated based on plaintiff's February 17, 2018 misconduct, coupled with his lack of remorse for his behavior on that day.  But viewed in the light most favorable to plaintiff, the evidence supports an inference that plaintiff's employment was terminated based on plaintiff's complaints of race discrimination, even if plaintiff's February 17, 2018 misconduct was also a reason for the decision.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (retaliation claim requires proof that desire to retaliate was the but-for cause of decision but not necessarily sole cause of decision).  The termination decision was made just two days after plaintiff, viewing the evidence in his favor, again complained about potential race discrimination in the distribution of sales leads.  Moreover, the Employee Notice of Warning

28

expressly references this complaint in the "Description of Violation" section.  And Ms. Stockwood, who drafted the final Employee Notice of Warning, testified that she understood that the reference to "your boys" was intended to indicate favoritism toward Caucasian sales managers. Thus, while defendants argue that the reference to the complaint does not indicate that it was a basis for plaintiff's discharge but merely a description of the "sequence of events" leading up to plaintiff's "bullshit" remark, a jury could reasonably conclude otherwise.

Thus, the record contains evidence from which a reasonable jury could determine that plaintiff's February 17, 2018 complaint to Mr. Raybourn about the distribution of sales leads was a complaint about race discrimination, that defendants understood the complaint as one of race discrimination, and that the complaint was a reason for plaintiff's discharge.  Additional evidence in the record supports plaintiff's pretext argument as well.  Mr. Raybourn testified that plaintiff was "very vocal" about racism and that he was upset that plaintiff and Mr. Monroe complained about race discrimination—a complaint that he called a "cheap shot and below the belt."  He testified that the complaint reflected poorly on plaintiff and Mr. Monroe and that having someone "shout racism" was disruptive to the dealership's business.   Ms. Velasquez averred that Mr. Raybourn told her that plaintiff and Mr. Monroe were "disruptive on the floor because everything was a race issue for them" and that he "made it clear that he wanted to get rid" of those employees. Suffice it to say, the evidence, viewed in plaintiff's favor, is sufficient to survive summary judgment on his retaliation claim and summary judgment on this claim is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' motion for summary judgment (doc. 45) is **granted in part and denied in part**.  The motion is granted as to

plaintiff's claim that defendants distributed sales leads based on race; granted as to plaintiff's claim that defendants denied him a bonus based on race; granted as to plaintiff's claim of racial harassment; denied as to plaintiff's discriminatory discharge claim; denied as to plaintiff's failure-to-promote claim; and denied as to plaintiff's retaliatory discharge claim.

**IT IS FURTHER ORDERED BY THE COURT THAT** the parties' motions to file certain exhibits under seal (doc. 51, 53) are **denied.**

**IT IS SO ORDERED.**

Dated this 18th day of May, 2020, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge